# THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* EMR Quality, LLC, P.O. BOX 55 CUYAHOGA FALLS, OH 44222<br><br>Relator,<br><br>v.<br><br>NORTHEAST OHIO CARDIOVASCULAR SPECIALISTS C/O WALTER F EHRNFELT 1991 CROCKER RD, STE 550 WESTLAKE, OH 44145<br><br>and<br><br>SUMMA PHYSICIANS, INC., WILLIAM A. POWEL III 525 E MARKET ST AKRON, OH 44304<br><br>and<br><br>SUMMA HEALTH SYSTEM C/O WILLIAM A. POWEL 525 E MARKET ST AKRON, OH 44304<br><br>Respondents. | No. 1:14 CV 1792<br><br>FILED IN CAMERA AND UNDER SEAL<br><br>JURY TRIAL DEMAND<br><br>JUDGE WELLS<br>MAG. JUDGE VECCHIARELLI |

## RELATOR'S COMPLAINT WITH JURY DEMAND

On behalf of the United States, EMR Quality, LLC, through counsel, sues Respondents Northeast Ohio Cardiovascular Specialists, Inc (NEOCS), Summa Physicians, Inc. (SPI), and Summa Health System (SUMMA) and alleges:

## I. THE PARTIES

1. This is an action for damages and civil penalties on behalf of the United States of America through the Relator, arising from the Respondents' violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*. Respondents' conduct, as alleged with particularity below, includes making false claims for reimbursement from federal health care programs, causing others to make false claims for reimbursement from federal health care programs, and using false records and statements to support those false claims.

2. NEOCS is the largest cardiology practice in the Akron area, with offices on the campuses of Akron General Hospital, Summa's Akron City Hospital, and in the cities of Barberton, Ravenna and Wadsworth.

3. NEOCS' twenty five (25) cardiologists are employed by SUMMA and serve approximately 150,000 patients in Summit, Portage, Medina, and Wayne counties.

4. SPI consists of the employed physicians of Summa Health System who practice at over 100 locations throughout Summit, Medina, Portage, Stark and Wayne counties including the NEOCS cardiologists.

5. SUMMA is a not-for-profit corporation comprising seven owned, affiliated and joint venture hospitals, a regional network of ambulatory centers, a network of over 1,000 physicians that includes over 290 employed multi-specialty groups, a 230,000+ member health plan, a system-level foundation and 9,500 employees, nurse and healthcare professionals.

6. Relator EMR Quality, LLC is an Ohio limited liability company formed to combat medical false claims billed to the federal health care programs

2

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b). This court has personal jurisdiction over the Respondents under 31 U.S.C. § 3732(a).

8. Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because the Respondents can be found in, and transact business in, this Judicial District.

## III. FEDERAL HEALTH CARE PROGRAMS

### A. Medicare

9. In 1965, Congress enacted Title XVIII of the Social Security Act, which established Medicare to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

10. Medicare has three parts: Part A, Part B, and Part D.

11. Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

12. Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, and other medical services not covered by Part A. Part B also helps pay for covered health services and supplies when they are medically necessary.

13. Medicare Part D provides prescription drug benefits.

14. The Medicare Program is administered through the United States Department of Health and Human Services (HHS) and, specifically, the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

15. Much of the daily administration and operation of the Medicare Program is managed through private insurers under federal contracts.

16. Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare under rules developed by the Health Care Financing Administration (HCFA).

17. Under Medicare Part B, the federal government contracts with insurance companies and organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

18. Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans offered by private companies that contract with the federal government.

19. Payments from the Medicare Program come from a trust fund - known as the Medicare Trust Fund - which is funded through payroll deductions taken from the work force, besides government contributions.

20. The principal function of intermediaries and carriers is to pay for Medicare services, and audit claims for those services to assure that federal funds are spent properly.

21. To participate in Medicare, providers must assure their services are provided economically and only when medically necessary.

22. Medicare only reimburses costs for medical services needed for the prevention, diagnosis, or treatment of a specific illness or injury.

**B. Medicaid**

23. Created in 1965, The Medicaid program aids states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

24. Medicaid is a cooperative federal-state public assistance program administered by the states.

25. Funding for Medicaid is shared between the federal government and those state governments that participate in the program. Federal support for Medicaid is significant. The federal government provides 50% of Ohio's Medicaid funding.

26. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, Medicaid coverage and eligibility guidelines vary from state to state.

27. To receive federal matching funds, a state Medicaid program must meet minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

### C. Other Federal Health Care Programs

28. Besides Medicaid and Medicare, the federal government pays for health care under other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the: Federal Employees Health Benefit Program.

29. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

30. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service connected disability.

31. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

### D. Medicare Advantage Plans and Risk Scoring False Claims

32. The "Medicare Modernization Act of 2003" created Medicare Advantage, which relies on the "Hierarchical Condition Category" (HCC) system to formulate payments for participating managed care plans.

33. HCC payment matches the individual health risk profile of each Medicare Advantage member with the premiums paid to the plan bearing the risk. Age-sex modifiers play a minor role in determining premium rate-setting. The HCC system utilizes ICD-9 diagnostic information as the primary indicator of each member's health status. ICD-9 codes are mapped to HCC disease categories, which dictate the premiums paid to the Medicare Advantage plan.

6

34. This prospective payment system is "health status based risk adjustment", or, in its abbreviated form, "risk adjustment."

35. The HCC risk adjusted payment system provides plans more money for members with higher burden of illness and expected costs and utilization.

36. The system pays less for members inferred to be "healthier", based on more favorable, less morbid diagnosis profiles. (the HCC system is revenue-neutral, so plans with "healthier" members would see a drop in their reimbursement.)

37. Physician and hospital claims are submitted monthly to CMS, which then maintains a risk score by beneficiary based on current claims documentation.

38. The beneficiary's array of diagnoses is refreshed annually. If a complex diabetic (kidney disease, heart disease, peripheral vascular disease) has provider claims submitted lacking the ICD-9 diagnoses at least annually, that patient's premium reimbursement to the plan devolves to a lower rate, although the patient remains medically complex and at high risk for utilization.

39. As stated in the Medicare Managed Care Manual, "Beneficiary risk scores are used to adjust each plan's base payment rate for member health status. The risk score is computed for each beneficiary for a given year and applied prospectively. The risk score follows the beneficiary for one calendar year."

40. Since CMS only accepts provider in-and out-patient attestation of a beneficiary's burden of illness, in the form of in or out-patient ICD-9 diagnosis arrays, the provider becomes key in maintaining risk-scores and, indirectly, reimbursement to the plan. The plan depends on provider documentation for its economic survival.

41. HCFA 1500 Forms bearing current diagnoses must be submitted by date of service by providers, even if they are paid on a capitated basis by the plan. Capitated providers have no incentive to submit claim forms, since they are not paid on a fee-for-service basis. Absent these claims and diagnoses, the plan loses valuable, current diagnostic information on members, which leads to lower payment from CMS.

42. Medicare anticipated that potential for up-coding would accompany this reimbursement methodology, since provider diagnosis submissions directly affect plan revenues, and provider diagnoses have heretofore not been subject to audit.

43. The Center on Budget and Policy Priorities outlined the potential harm to the Medicare Advantage program, absent meaningful audits and sanctions for overstating Medicare beneficiaries' burden of illness. The HCC risk adjustment program was designed with the objective of appropriate payment to plans with medically complex members; it was also intended to reduce inappropriate prospective capitated payments in behalf of members at lower risk of utilization. Flagrant exaggeration of member risk scores drive up plan payments beyond their actuarial cost risk.

44. Physicians are at risk for pressure from the plans, as a plan that intends to defraud Medicare wants the most medically complex diagnoses applicable to a member to realize optimal plan reimbursement. Many ICD-9's are for heart disease patients implying a broad range in complexity and severity, with a corresponding impact on payments.

45. The submission of an inaccurate complex level of diagnoses for a heart patient is up-coding by the managed care organization; a more blatant method of fraud is if the managed care organization changes the physician coding.

46. While one set of ICD-9's may be the only ones which apply based on clinical evidence, stretching the clinical "facts" yields a different set of ICD-9's which provide the plan higher payment.

47. This distorts the patients' clinical complexity and can put pressure on physicians to use their attestation authority to the advantage of the plan.

48. Medicare then pays a premium for a member not supported by that member's medical complexity and future risk for unusual utilization costs.

49. Because premiums are paid based on documents containing these numbers, CMS relies on plans to report correct data for membership, residence information, and claims costs.

50. CMS creates the HCC profiles, based on diagnoses submitted to CMS during the year on UB92 and HCFA1500 Forms

51. When Medicare pays more to the plan based on false data it directly violates the False Claims Act.

**E. The Physician Quality Reporting System**

52. The Physician Quality Reporting System (PQRS) is a voluntary reporting program which provides an incentive payment to practices with eligible professionals (identified on claims by their individual National Provider Identifier [NPI] and Tax Identification Number [TIN]) who satisfactorily report data on quality measures for covered Physician Fee Schedule (PFS) services furnished to Medicare Part B Fee-For-Service (FFS) beneficiaries.

IV. **RESPONDENTS' FALSE CLAIMS**

### A. Upcoding

53. Each procedure performed by a doctor or healthcare provider has a current procedural terminology (CPT) code attached allowing them to be paid by federal health care programs and an International Statistical Classifications of Diseases (ICD) code.

54. ICD codes are alphanumeric designations given to every diagnosis, description of symptoms and cause of death attributed to human beings.

55. The CPT and ICD codes determine the amount of payment.

56. Different codes allow billing for various amounts of money.

57. When the provider correctly codes, the provider will be paid for the services and procedures performed.

58. Upcoding, refers to the practice of assigning a code that commands more money than the correct code would pay.

59. Upcoding hurts patients by misclassifying their conditions and treatment history resulting in inaccurate medical records and future treatment protocols.

60. NEOCS' billing system auto populates ICD-9 428 series of codes which should only be used for heart failure for heart dysfunction.

61. Heart dysfunction should be input under the 429 series of codes. Ex. 1.

62. NEOCS receives greater Medicare reimbursement due to these upcoded patients.

63. SUMMA operates an advantage care plan which also receives greater reimbursement based on bad data due to upcoding.

64. SPI doctors participate in PQRS and by classifying patients as more complex, ICD-9 428 instead of 429, SPI doctors are given greater PQRS incentive payments.

65. Approximately 1/3 of NEOCS patients suffer from heart dysfunction and are classified as heart failure under the ICD-9 428 series of codes.

66. Examples of upcoding are Patients A, B, C, D, and E who suffer from dysfunction but are classified as heart failure.

67. For these patients there is a danger is they could be subjected to unnecessary treatment protocols for heart failure.

### B. Meaningful Use

68. Eligible Professionals (EP) who meet the eligibility requirements and adopt, implement, upgrade or "meaningfully use" certified Electronic Health Record technology can receive incentive payments from the federal government.

69. Meaningful use attestation, in a health information technology (HIT) context, is a process that documents that an organization or individual has successfully demonstrated meaningful use and is fulfilling the requirements for electronic health records (EHR) and related technology.

70. The Health Information Technology for Economic and Clinical Health (HITECH) Act of 2009, requires organizations eligible for the Medicare Electronic Health Record (EHR) incentive program to attest to meaningful use to be eligible for EHR incentive payments.

71. Respondents' executives have attested to the organizations' eligibility knowing that some physicians were violating program requirements yet received incentive payments.

### C. **Failure to refund overpayments**

72. The Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 (PPACA), significantly changed the duty to report and refund Medicare Parts A and B overpayments codified at 42 U.S.C. §1320a-7k(d) - Reporting and Returning of Overpayments:

    (1) In general.— If a person has received an overpayment, the person shall (A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and (B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

    (2) Deadline for reporting and returning overpayments.— An overpayment must be reported and returned under paragraph (1) by the later of (A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable.

    (3) Enforcement.— Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31, United States Code) for purposes of section 3729 of such title.

    (4) Definitions.— In this subsection:
    (A) Knowing and knowingly.— The terms knowing and knowingly have the meaning given those terms in section 3729(b) of title 31, United States Code.
    (B) Overpayment.— The term "overpayment" means any funds that a person receives or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title.

73. Medicare overpayment occurs where the Medicare payment exceeds what should have been paid.

74. The Respondents knowingly upcoded and submitted false meaningful use data to receive Medicare payments they were not entitled to triggering a duty to return the overpayments within 60 days.

12

75. Because of Respondents' fraudulent conduct, Medicare unwittingly paid reimbursements for services for which Respondents were not entitled to receive any payment.

76. Respondents' fraudulent scheme has caused and continues to cause Medicare to pay Respondents higher reimbursement amounts than Respondents are entitled to receive.

77. Respondents failed to return the resulting overpayments.

## **RESPONDENTS' VIOLATIONS OF THE FALSE CLAIMS ACT**

78. Relator incorporates by reference and re-alleges the above paragraphs as if fully set forth herein.

79. To increase payments from federal health care programs, Respondents knowingly engaged, and continue to engage, in the pattern and practice of upcoding, falsifying meaningful use data, and failing to report resulting overpayments.

80. The false claims Respondents submitted to federal health care programs damage the United States.

81. Respondents continue to fail to report the resulting overpayments.

82. 31 U.S.C. § 3729 of the FCA states:

(a) LIABILITY FOR CERTAIN ACTS

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E)     is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F)     knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

83. Respondents knowingly presented, or caused to be presented, false or fraudulent claims to a federal government healthcare program for payment or approval.

84. Respondents knowingly made, used, or caused to be made or used, a false record or statement material to getting a false or fraudulent claim paid or approved by the Government.

85. Respondents defrauded the Government by conspiring to get false claims paid.

86. Respondents, by not returning overpayments, have possession, custody, or control of property or money used, or to be used, by the Government and have knowingly delivered, or caused to be delivered, less than all of that money or property;

87. Respondents knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government.

88. The Government, unaware of the falsity of the records, statements or claims made or caused to be made by Respondents, paid federal health care claims that would otherwise not have been allowed.

89. By these payments, the Government has been damaged and continues to suffer damages in a substantial amount.

## PRAYER

WHEREFORE, Relator prays for judgment against Respondents as follows:

a. That Respondents be found to have violated and be enjoined from future violations of the Federal False Claims Act;

b. That this Court enter judgment against Respondents for the maximum damages sustained by the Federal Government for each violation of the Federal False Claims Act;

c. That this Court enter judgment against Respondents in an amount equal to three times the damages the Government has sustained because of Respondents' false or fraudulent claims, plus the maximum civil penalty for each violation of the Federal False Claims Act;

d. That Relator be awarded the maximum amount allowed under the Federal False Claims Act;

e. That Relator be awarded costs, including expert witness fees, attorneys' fees, and court costs.

f. That Relator recovers such other relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Warner Mendenhall*

Warner Mendenhall
Ohio Bar No. 0070165
The Law Offices of
Warner Mendenhall, Inc.
190 N. Union St. Suite 201
Akron, OH 44304
*Attorney for Relator*

## Jury Demand

Relator requests a jury trial.

*/s/ Warner Mendenhall*

Warner Mendenhall, 0070165